**PELTON GRAHAM LLC**
Brent E. Pelton (BP 1055)
Taylor B. Graham (TG 9607)
Kristen E. Boysen (KB 0208)
111 Broadway, Suite 1503
New York, NY 10006
Telephone: (212) 385-9700
www.peltongraham.com

*Attorneys for Plaintiffs and the putative*
*FLSA Collective and Class*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| **ORHAN HAKAJ, YAROSLAV LUPACHOV and SAHRUDIN RADONCIC, Individually and on Behalf of All Others Similarly Situated,**<br><br>                                        **Plaintiffs,**<br><br>-against-<br><br>**THE ORIGINAL HOMESTEAD RESTAURANT INC. d/b/a OLD HOMESTEAD STEAKHOUSE, MARC SHERRY and GREGORY SHERRY, Jointly and Severally,**<br><br>                                        **Defendants.** | **CLASS & COLLECTIVE ACTION COMPLAINT**<br><br><br>**Jury Trial Demanded** |

        Plaintiffs Orhan Hakaj, Yaroslav Lupachov and Sahrudin Radoncic (collectively, the "Plaintiffs"), individually and on behalf of all others similarly situated, as collective and class representatives, upon personal knowledge as to themselves and upon information and belief as to other matters, allege as follows:

**NATURE OF THE ACTION**

1.      Plaintiffs are servers at Defendants' steakhouse located in the Meatpacking District neighborhood of Manhattan, New York. For their work, during the relevant time period, Plaintiffs were not paid minimum wages for all hours that they worked and were not paid overtime premiums for hours worked in excess of forty (40) in a given workweek. Further, due to Defendants' practice of inaccurately clocking employees in and/or out and shaving time from Plaintiffs' payments, Plaintiffs were not paid wages of any kind for numerous hours that they worked.

2.      Plaintiffs bring this action to recover unpaid minimum wages and overtime premium pay owed to them pursuant to both the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 201 *et seq.* and the New York Labor Law ("NYLL"), §§ 650 *et seq*. Plaintiffs also bring claims for unpaid wages pursuant to NYLL §§ 190 & 193, unpaid spread-of-hours premiums, unlawfully withheld gratuities, and for failure to provide proper wage statements pursuant to NYLL §§ 190 *et seq.* and the supporting regulations.

3.      Plaintiffs bring their FLSA claims on behalf of themselves and all other similarly situated employees of Defendants.

4.      Plaintiffs bring their NYLL unpaid minimum wages, unpaid overtime, unpaid wages, unpaid spread-of-hours and wage statement claims on behalf of themselves and a Federal Rule of Civil Procedure 23 class of all non-management restaurant employees working for Defendants in New York during the six (6)-year period, plus COVID-19 tolling, preceding the filing of this complaint.

5.      Plaintiffs Hakaj, Lupachov and Radoncic also bring their NYLL unlawfully withheld gratuities claim on behalf of themselves and a subclass of all employees who worked for Defendants as servers.

6.     When Plaintiffs Hakaj and Radoncic questioned management about certain of Defendants' policies, including Old Homestead's failure to pay wages for all hours worked or overtime premiums for hours worked in excess of forty (40) in a week, as well as in response to Hakaj and Radoncic's meetings and discussions with counsel in an effort to recover unpaid wages and related discussions with coworkers, Defendants routinely failed to assign customers to Hakaj and Radoncic's respective stations and called other, less senior employees to work busy shifts and private events in lieu of Hakaj and Radoncic. Thus, Plaintiffs Hakaj and Radoncic bring individual claims for retaliation under § 215(a)(3) of the FLSA and § 215 of the NYLL.

## JURISDICTION AND VENUE

7.     This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331, 1337, and 1343, and supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367. In addition, the Court has jurisdiction over Plaintiffs' claims under the FLSA pursuant to 29 U.S.C. § 216(b).

8.     Venue is proper in this district pursuant to 28 U.S.C. § 1391 because Defendants' business is located in this district and a substantial part of the events or omissions giving rise to the claims occurred in this district.

9.     This Court is empowered to issue a declaratory judgment pursuant to 28 U.S.C. §§ 2201 and 2202.

10.     On March 20, 2020, New York Governor Andrew M. Cuomo signed Executive Order 202.8 in an effort to stem the spread of COVID-19, which tolls for thirty (30) days "any specific time limit[s] for the commencement, filing, or service of any legal action, notice, motion or other process or proceeding" under any New York State laws or court procedural rules. The thirty (30)-day tolling period began on March 20, 2020 and continued until April 19, 2020. On

April 7, 2020, Governor Cuomo signed Executive Order 202.14, which extended the tolling period to May 7, 2020. Subsequently, on May 7, 2020, Governor Cuomo issued Executive Order 202.28, tolling all statutes of limitations for an additional thirty (30) days through June 6, 2020. On June 6, 2020, Governor Cuomo issued Executive Order 202.38, tolling all statutes of limitations until July 6, 2020. On July 7, 2020, Governor Cuomo issued Executive Order 202.48 tolling all statutes of limitations until August 5, 2020. On August 5, 2020, Governor Cuomo issued Executive Order 202.55, which tolled all statutes of limitations until September 4, 2020. On September 4, 2020, Governor Cuomo signed Executive Order 202.60, which extended the tolling period an additional thirty (30) days to October 4, 2020. On October 4, 2020, Governor Cuomo issued Executive Order 202.67, which extended the tolling period to November 3, 2020. In total, the Executive Orders set forth herein provided for a toll of two hundred and twenty-eight (228) days.

## THE PARTIES

**Plaintiffs:**

11.     Plaintiff Orhan Hakaj ("Hakaj") was, at all relevant times, an adult individual residing in Richmond County, New York.

12.     Plaintiff Yaroslav Lupachov ("Lupachov") was, at all relevant times, an adult individual residing in Rockland County, New York and Hudson County, New Jersey.

13.     Plaintiff Sahrudin Radoncic ("Radoncic") was, at all relevant times, an adult individual residing in Queens County, New York.

14.     Throughout the relevant time period, Plaintiffs performed work for Defendants at their restaurant located at 56 9th Avenue, New York, New York 10011.

15.     Plaintiffs consent in writing to be parties to this action, pursuant to 29 U.S.C. § 216(b), and their consent forms are attached hereto.

**<u>Defendants</u>:**

16.     <u>The Original Homestead Restaurant Inc.</u> is an active New York Corporation doing business as "Old Homestead Steakhouse," with its principal place of business at 56 9th Avenue, New York, New York 10011.

17.     According to the New York State Department of State, Division of Corporations, The Original Homestead Restaurant Inc. was registered on September 4, 1941.

18.     According to the New York State Department of State, Division of Corporations, <u>Defendant Gregory Sherry</u> ("G. Sherry") is the chief executive officer of The Original Homestead Restaurant Inc.

19.     The Original Homestead Restaurant Inc. is hereinafter referred to as "Old Homestead" or the "Corporate Defendant."

20.     Defendants G. Sherry and <u>Marc Sherry</u> ("M. Sherry" and, together with G. Sherry, the "Individual Defendants") are owners and operators of Old Homestead who set Defendants' payroll policies, including the unlawful practices complained of herein. Throughout the relevant time period, G. Sherry and M. Sherry were in charge of determining the Corporate Defendant's policies with respect to payroll, and otherwise running the business of the Corporate Defendant.

21.     The Corporate Defendant and the Individual Defendants are hereinafter collectively referred to as the "Defendants."

22.     The Individual Defendants maintained operational control over and managed the Corporate Defendant by supervising and determining the wages and compensation of employees, maintaining employee records and through possessing the authority to hire and fire employees.

23.     The Individual Defendants participated in the day-to-day operations of the Corporate Defendant and acted intentionally in their direction and control of Plaintiffs and

Defendants' other similarly situated employees. The Individual Defendants are "employers" pursuant to the FLSA, 29 U.S.C. § 203(d), 29 C.F.R. § 791.2, as well as the NYLL § 2 and the regulations thereunder, and are jointly and severally liable with the Corporate Defendant.

24.    The Individual Defendants jointly employed Plaintiffs and all similarly situated employees by acting in the interest of each other with respect to the employees, paying employees by the same methods and sharing control over the employees.

25.    At all relevant times, Defendants have been and continue to be employers engaged in interstate commerce and/or the production of goods for commerce, within the meaning of the FLSA, 29 U.S.C. §§ 206(a) and 207(a).

26.    At all relevant times, Defendants employed, and/or continue to employ, Plaintiffs and each of the Collective Action members within the meaning of the FLSA.

27.    At all relevant times, Plaintiffs and the Class Members were employed by Defendants within the meaning of the NYLL, §§ 2 and 651.

28.    Upon information and belief, at all relevant times, the Corporate Defendants have had gross annual revenues in excess of $500,000.00.

29.    According to the New York State Liquor Authority, Division of Alcoholic Beverage Control, Defendants M. Sherry and G. Sherry own the liquor license to Old Homestead and are therefore "responsible for the activities of employees and patrons in all parts of the licensed premises" and are "required to maintain adequate books and records of all the transactions involving [the] licensed business. This includes records recording [the licensees'] employees, whether full or part-time." (*See* State Liquor Authority, Retail Licensees Handbook, at 17).[1]

---

[1] Available at https://sla.ny.gov/system/files/documents/2019/09/State%20Liquor%20Authority-RetailLicensees%20Handbook_2019_forweb.pdf.

30.    Defendants and general manager Luis Acosta ("Acosta"), were previously sued in this Court for unpaid minimum wages, unpaid overtime premiums, unlawfully expropriated tips and unlawful wage deductions in *Sayed Khalil, et al. v. The Original Homestead Restaurant Inc., et al.*, Civil Action No. 07-cv-695. Thus, because Defendants were on notice of the relevant state and federal wage-and-hour laws since prior to the time period relevant herein, Defendants willfully violated Plaintiffs' and the Collective and Class Members' rights in failing to pay minimum wages for all hours worked and overtime premiums for hours worked in excess of forty (40) in a week.

31.    Upon information and belief, Defendants M. Sherry and G. Sherry were in constant contact with accountant Martin Osika ("Osika"), Acosta, and Defendants' other managers to ensure that the restaurant was operating in accordance with their standards and policies.

## FLSA COLLECTIVE ACTION ALLEGATIONS

32.    Pursuant to 29 U.S.C. §§ 206, 207 & 216(b), Plaintiffs bring their First and Second Causes of Action as a collective action under the FLSA on behalf of themselves and the following collective:

> All persons employed by Defendants at any time since January 13, 2019 and through the entry of judgment in this case (the "Collective Action Period") who worked as non-management employees at Old Homestead Steakhouse (the "Collective Action Members").

33.    A collective action is appropriate in this circumstance because Plaintiffs and the Collective Action Members are similarly situated, in that they were all subjected to Defendants' illegal policies of failing to pay minimum wage for all hours worked and failing to pay overtime premiums for work performed in excess of forty (40) hours each week. As a result of these policies, Plaintiffs and the Collective Action Members did not receive the legally-required minimum wages for all hours worked or overtime premium payments for all hours worked in excess of forty (40) hours per week.

34.     Plaintiffs and the Collective Action Members have substantially similar job duties and were paid pursuant to a similar, if not the same, payment structure.

**NEW YORK FED. R. CIV. P. 23 CLASS ACTION ALLEGATIONS**

35.     Pursuant to the NYLL, Plaintiffs bring their Third through Seventh Causes of Action under Rule 23 of the Federal Rules of Civil Procedure on behalf of themselves and the following class:

> All persons employed by Defendants at any time since May 30, 2015 and through the entry of judgment in this case (the "Class Period") who worked as non-management employees at Old Homestead Steakhouse (the "Class Members").

36.     <u>The Class Members are readily ascertainable</u>. The number and identity of the Class Members are determinable from the records of Defendants. For purposes of notice and other purposes related to this action, their names and addresses are readily available from Defendants. Notice can be provided by means permissible under Fed. R. Civ. P. 23.

37.     <u>The Class Members are so numerous that joinder of all members is impracticable.</u>

38.     Upon information and belief, there are in excess of forty (40) Class Members.

39.     <u>The questions of law and fact common to the Class predominate over any questions solely affecting the individual members of the Class</u>. These common questions include, but are not limited to:

a.   whether Defendants employed Plaintiffs and the Class Members within the meaning of the NYLL;

b.   whether Defendants failed to keep true and accurate time records for all hours worked by Plaintiffs and the Class Members;

c.   whether Defendants failed and/or refused to pay Plaintiffs and the Class Members minimum wages for all hours worked;

d.   whether Defendants failed and/or refused to pay Plaintiffs and the Class Members for all hours that they worked;

e.   whether Defendants properly notified Plaintiffs and Defendants' other tipped employees that they were taking the "tip credit" against the full minimum wage;

f.   whether Defendants failed and/or refused to pay Plaintiffs and the Class Members overtime premiums for hours worked in excess of forty (40) hours per workweek;

g.   whether Defendants failed and/or refused to pay Plaintiffs and the Class Members wages for all hours worked;

h.   whether Defendants failed to pay Plaintiffs and the Class Members an extra hour of minimum wage when working shifts in excess of ten (10) hours and/or split shifts;

i.   whether Defendants' failure to properly pay Plaintiffs and the Class Members lacked a good faith basis;

j.   whether Defendants failed to provide Plaintiffs and the Class Members with a proper statement of wages with every wage payment as required by the NYLL;

k.   whether Defendants are liable for all damages claimed hereunder, including but not limited to compensatory damages, liquidated damages, interest, costs and disbursements and attorneys' fees.

40.   Plaintiffs' claims are typical of the Class Members' claims. Plaintiffs, like all Class Members, were restaurant employees of Defendants who worked for Defendants pursuant to their corporate policies. Plaintiffs, like all Class Members, were, *inter alia*, paid less than the statutory minimum wage, were not paid overtime premium pay for hours worked over forty (40) hours in a

given workweek, were not paid wages of any kind for certain hours worked, were not paid spread-of-hours premiums when working a shift of ten (10) or more hours and/or a split shift, and did not receive proper wage statements and wage notices. If Defendants are liable to Plaintiffs for the claims enumerated in this Complaint, they are also liable to all Class Members.

41.    <u>Plaintiffs and their Counsel will fairly and adequately represent the Class</u>. There are no conflicts between Plaintiffs and the Class Members, and Plaintiffs bring this lawsuit out of a desire to help all Class Members, not merely out of a desire to recover their own damages.

42.    Plaintiffs' counsel are experienced class action litigators who are well-prepared to represent the interests of the Class Members.

43.    <u>A class action is superior to other available methods for the fair and efficient adjudication of this litigation</u>.

44.    Defendants are sophisticated parties with substantial resources. The individual plaintiffs lack the financial resources to vigorously prosecute a lawsuit in federal court against corporate defendants.

45.    The individual members of the Class have no interest or capacity to bring separate actions; Plaintiffs are unaware of any other current litigation concerning this controversy; it is desirable to concentrate the litigation in one case; and there are no likely difficulties that will arise in managing the class action.

## TIPPED SUBCLASS

46.    Pursuant to the NYLL, Plaintiffs Hakaj, Lupachov and Radoncic bring their Eighth Cause of Action under Rule 23 of the Federal Rules of Civil Procedure on behalf of themselves and the following subclass of the Class:

> All persons employed by Defendants at any time since May 30, 2015
> and through the entry of judgment in this case (the "Class Period")

who worked as servers at Old Homestead Steakhouse (the "Tipped Subclass Members").

47.    <u>The Tipped Subclass Members are readily ascertainable</u>. The number and identity of the Tipped Subclass Members are determinable from the records of Defendants. For purposes of notice and other purposes related to this action, their names and addresses are readily available from Defendants. Notice can be provided by means permissible under Fed. R. Civ. P. 23.

48.    <u>The Tipped Subclass Members are each so numerous that joinder of all members is impracticable</u>.

49.    Upon information and belief, there are in excess of forty (40) Tipped Subclass Members.

50.    <u>The questions of law and fact common to the Tipped Subclass Class predominate over any questions solely affecting the individual members of the Tipped Subclass Class</u>. These common questions include, but are not limited to:

a.    whether Defendants illegally retained gratuities left by customers and failed to pay all such gratuities to Plaintiffs Hakaj, Lupachov and Radoncic and the New York Tipped Subclass members;

b.    whether Defendants properly notified Plaintiffs Hakaj, Lupachov and Radoncic and the Tipped Subclass Members that they were taking the "tip credit" against the full minimum wage;

c.    whether Defendants' failure to properly pay Plaintiffs Hakaj, Lupachov and Radoncic and the Tipped Subclass Members lacked a good faith basis; and

d.    whether Defendants are liable for all damages claimed hereunder, including but not limited to compensatory damages, liquidated damages, interest, costs and disbursements and attorneys' fees.

51.     Plaintiffs Hakaj, Lupachov and Radoncic's claims are typical of the Tipped Subclass Members' claims. Plaintiffs Hakaj, Lupachov and Radoncic, like all Tipped Subclass Members, were tipped employees of Defendants who worked for Defendants pursuant to their corporate policies. Plaintiffs Hakaj, Lupachov and Radoncic, like all Tipped Subclass Members, were, *inter alia*, not notified of Defendants' reliance on the tip-credit to lower the minimum wage and were not paid all of the gratuities that they earned. If Defendants are liable to Plaintiffs Hakaj, Lupachov and Radoncic for the claims enumerated in this Complaint, they are also liable to all Tipped Subclass Members.

52.     Plaintiffs Hakaj, Lupachov and Radoncic and their Counsel will fairly and adequately represent the Tipped Subclass. There are no conflicts between Plaintiffs Hakaj, Lupachov and Radoncic and the Tipped Subclass Members, and Plaintiffs Hakaj, Lupachov and Radoncic bring this lawsuit out of a desire to help all Tipped Subclass Members, not merely out of a desire to recover their own damages.

53.     Plaintiffs' counsel are experienced class action litigators who are well-prepared to represent the interests of the Tipped Subclass Members.

54.     A class action is superior to other available methods for the fair and efficient adjudication of this litigation.

55.     Defendants are sophisticated parties with substantial resources. The individual plaintiffs lack the financial resources to vigorously prosecute a lawsuit in federal court against corporate defendants.

56.     The individual members of the Tipped Subclass have no interest or capacity to bring separate actions; Plaintiffs are unaware of any other current litigation concerning this controversy; it is desirable to concentrate the litigation in one case; and there are no likely difficulties that will

arise in managing the class action.

## STATEMENT OF FACTS

**Defendants' Restaurant**

57.     At all relevant times, Defendants have been in the food service business.

58.     In addition to the 9th Avenue location in Manhattan, Old Homestead has franchise outposts located in Caesars Palace Hotel and Casino in Las Vegas, Nevada and the Borgata Hotel and Casino in Atlantic City, New Jersey.

59.     On several occasions, certain employees of Defendants, including Plaintiffs, received three to four (3-4) paystubs from Defendants containing two (2) different addresses purporting to belong to Old Homestead. Specifically, the address that appeared on the payroll slip containing employees' gross and net wages and tax breakdown displayed the 56 9th Avenue, New York, New York 10011 address, while the corresponding check stub listed the address for "Old Homestead Restaurant" as 401 2nd Avenue, Apt. 5F, New York, New York 10010.

60.     The Individual Defendants have owned, operated and managed Old Homestead throughout the Relevant Time Period.

61.     According to the website for Old Homestead Steakhouse, "Old Homestead has operated from the same place since opening its doors in 1868 – making it one of the longest continually serving restaurants in America." *See* https://www.theoldhomesteadsteakhouse.com.

62.     Upon information and belief, Old Homestead's letterhead boasts that the restaurant is "New York's Oldest Steakhouse."

63.     Old Homestead Steakhouse was temporarily closed on two (2) occasions due to the COVID-19 global pandemic, from approximately mid-March 2020 through on or about August 1, 2020 and again from in or around mid-December 2020 through in or around mid-February 2021.

64.     Upon information and belief, the Corporate Defendant received at least two (2) Small Business Administration Payroll Protection Program ("PPP") loans in the amounts of $756,400.00 and $1,059,000.00 in 2020 and 2021, respectively. *See* https://projects.propublica.org/coronavirus/bailouts/loans/the-original-homestead-4267327200; https://projects.propublica.org/coronavirus/bailouts/loans/the-original-homestead-2130538309.

65.     Upon information and belief, Old Homestead reported fifty-eight (58) and fifty-nine (59) jobs retained on recent applications for federal PPP grants. *Id.*

66.     Upon information and belief, Old Homestead received approximately $3.6 million in 2021 from the Restaurant Revitalization Fund. *See* https://data.sba.gov/dataset/rrf-foia/resource/611f26df-0de0-427d-adb1-3bb91c8e8846.

67.     Upon information and belief, Old Homestead received a $10,000.00 EIDL grant in 2021. *See* https://helloskip.com/eidl-data/?ref=SkipBlog520 (search for "Original Homestead" last executed January 13, 2022).

68.     Upon information and belief, the Individual Defendants are members of 56 Ninth Avenue LLC, the corporate entity that owns the building where Old Homestead is located.

69.     56 Ninth Avenue LLC is an active New York limited liability company with its principal place of business located at 56 9th Avenue, New York, New York 10011. 56 9th Avenue LLC was registered on May 17, 2012.

70.     At all relevant times, the Individual Defendants have managed the operations of Old Homestead and taken an active role in ensuring that the business is run in accordance with their procedures and policies and otherwise overseeing the operations of the restaurant. Throughout the relevant time period, the Individual Defendants often instructed Acosta and other managers to correct certain employees when the Individual Defendants observed behaviors that

did not meet their standards (e.g., servers setting plates down too loudly, chatting with one another or reporting to work unshaven or with an unclean or unironed shirt). The Individual Defendants additionally participated in the interview process for maître ds and hosts/hostesses and occasionally unilaterally brought in service staff to work in the restaurant. On one recent occasion, Defendant G. Sherry fired a server and a hostess after receiving a video via e-mail that appeared to show the employees drinking red wine on the job. Acosta and Defendants' managers routinely informed Plaintiffs and the Class Members that they received directives regarding, *inter alia*, how many employees to staff during a given shift, the maximum number of hours that could appear on employees' paystubs (specifically, as described in greater detail below, a maximum of 40 hours prior to 2021, and a maximum of 29 hours starting in or around 2021), and the number of hours and shifts that employees were permitted to work. The Individual Defendants also frequently called the restaurant and spoke with Acosta, "Jerome," the maître d, or the manager on the floor to discuss how busy the restaurant was and how much money the restaurant had made and had in-person meetings with Osika, Acosta and the head chefs.

71.     As described below, the Individual Defendants communicated certain policies regarding the maximum number of hours for which Plaintiffs and the Class Members would be paid via payroll check to accountant Osika and various managers, including general manager Acosta.

72.     Upon information and belief, Defendant G. Sherry signed Plaintiffs' weekly paychecks.

73.     Upon information and belief, at all relevant times, the Individual Defendants had power over payroll and personnel decisions at Old Homestead, including the power to hire and fire employees, set their wages, retain time and/or wage records and otherwise control the terms and

conditions of their employment.

**Plaintiffs' Work for Defendants**

74.    **Plaintiff Hakaj** has been employed by Defendants as a server from in or around September 2001 through the present, excepting a period from approximately June 2019 through September or October 2019 when Plaintiff Hakaj was recovering from surgery (the "Hakaj Employment Period").

75.    From the start of the relevant time period to in or around 2018, Plaintiff Hakaj typically worked four (4) lunch shifts and five (5) dinner shifts over the course of five (5) days per week. During this period, Plaintiff Hakaj typically worked from between approximately 11:00 am and 12:00 pm to between approximately 10:00 pm and 11:00 pm, for an average of approximately fifty-five (55) hours per week.

76.    From in or around 2018 through in or around mid-March 2020, Plaintiff Hakaj typically worked five (5) days per week, from 11:00 am once or twice per week, and from 12:00 pm on the other days that he was assigned to work, to approximately 10:00 pm on weekdays. On Saturdays, Plaintiff Hakaj typically worked from approximately 1:00 pm to between 11:00 pm and 11:30 pm. In total, Plaintiff Hakaj typically worked an average of fifty to fifty-four (50-54) hours per week during this period.

77.    During the busier holiday season (i.e., November and December of each year), Plaintiff Hakaj typically worked six (6) days per week, from approximately 12:00 pm to between 10:00 pm and 11:00 pm on weekdays, and from 11:00 am to 1:00 am on Saturdays, for a total of approximately fifty-six to sixty (56-60) hours per week.

78.    During the first period that Old Homestead reopened after the start of the pandemic, from in or around August 2020 through in or around December 2020, Plaintiff Hakaj typically

worked five (5) days week, Tuesday through Saturday, from between approximately 5:00 pm and 6:00 pm to between approximately 10:00 pm and 11:00 pm when he worked both lunch and dinner shifts, and from approximately 5:00 pm or 6:00 pm to 10:00 pm when he worked a dinner shift, for a total of between approximately twenty-five to thirty (25-30) hours per week.

79.    From in or around February 2021 through the present, Plaintiff Hakaj has typically worked dinner shifts five (5) days per week, Tuesday through Saturday, from approximately between 5:00 pm and 6:00 pm to between 9:00 pm and 10:00 pm, for a total of approximately thirty-two to thirty-three (32-33) hours per week.

80.    During the relevant time period, Plaintiff Hakaj was frequently unable to take a break of any kind because the restaurant was busy.

81.    Throughout the Hakaj Employment Period, Plaintiff Hakaj has been paid the New York City tipped minimum wage for all hours for which he received compensation, plus tips. Thus, Plaintiff Hakaj was paid five dollars ($5.00) per hour from the start of the relevant time period to in or around December 2016, seven dollars and fifty cents ($7.50) per hour from in or around January 2017 through December 2017, eight dollars and seventy cents ($8.70) from in or around January 2018 through December 2018, and ten dollars per hour ($10.00) from in or around January 2019 through the present.

82.    During the Hakaj Employment Period, various floor managers and the restaurant's maître d inaccurately entered time on behalf of Hakaj into the Squirrel system. When Plaintiff Hakaj observed printouts from the Squirrel system showing the hours that managers or the maître d had recorded for him, he routinely observed that Defendants had credited him for at least five to six (5-6) fewer hours that he had worked during the week.

83.    On top of missing time due to Defendants' inaccurate timekeeping practices,

Defendants shaved additional time from Plaintiff Hakaj's payment by issuing paystubs showing payment for a maximum of forty (40) hours per week from the start of the relevant time period to in or around 2020, and a maximum of twenty-nine (29) hours starting in or around 2021.

84.     Throughout the Hakaj Employment Period, Plaintiff Hakaj did not receive wages of any kind for hours worked in excess of forty (40) in a week, much less overtime premiums of one and one-half (1.5) times his regular hourly rate.

85.     On one (1) occasion in or around 2017, Acosta informed Plaintiff Hakaj and certain other employees who worked lunch shifts that Acosta had had a meeting with Defendant G. Sherry, who had specifically informed him that employees' weekly paychecks were not to show payment for more than forty (40) hours, as Defendants did not want to pay overtime premiums.

86.     Similarly, on one (1) occasion shortly after the restaurant reopened a second time in February 2021, Acosta informed Plaintiffs Hakaj, Radoncic and Lupachov that Defendant M. Sherry had told Acosta that he did not want to pay employees for more than twenty-nine (29) hours on their weekly paychecks in order to avoid having to provide employees with health insurance.

87.     Although Acosta assured Plaintiff Hakaj that he would be paid for hours worked in excess of forty (40) during the 2020 holiday season, Plaintiff Hakaj was ultimately never paid wages of any kind for these hours.

88.     Although Plaintiff Hakaj routinely complained about substantial missing hours to Acosta, Acosta typically responded by informing Hakaj that Old Homestead was "paying a lot of vendors" and was "behind on the money," and assured Hakaj that he would be compensated at some unspecified time in the future.

89.     During the relevant time period, Defendants occasionally required Plaintiff Hakaj to pay back Defendants when Hakaj inadvertently overcharged or undercharged a customer, or the

customer walked out with paying the bill, such that the restaurant either did not receive the full amount of the bill or had to issue a refund to a customer. Specifically, managers withheld the amount lost from the incident from the tips of Hakaj and his front-of-the-house coworkers who worked that particular shift. For example, if a customer walked out without paying a $200.00 bill, and four (4) servers worked during the shift that the walkout occurred, managers would improperly hold the full $200.00 ($50.00 per server) from the servers' tips. Plaintiff Hakaj was ultimately never reimbursed for numerous payouts he was required to make from his tips to account for customer walkouts or customers who were mistakenly under or overcharged.

90.    **Plaintiff Lupachov** has been employed by Defendants as a server from in or around July 2003 through the present (the "Lupachov Employment Period").

91.    From the start of the relevant time period through in or around mid-March 2020, when the restaurant closed for the first time due to the pandemic, Plaintiff Lupachov typically worked five (5) days per week, from approximately 6:00 pm to 11:00 pm on weekdays, from approximately 6:00 pm to 12:00 am on Fridays and from approximately 12:00 pm to 12:00 am on Saturdays, for a total of approximately thirty-four to thirty-five (34-35) hours per week. Starting in or around October of each year, Plaintiff Lupachov additionally began working approximately two to three (2-3) doubles per week, as the busier holiday season approached.

92.    During the busier holiday season (i.e., November and December of each year), Plaintiff Lupachov typically worked six (6) days per week, from approximately 11:00 am or 12:00 pm to 12:00 am, for a total of approximately sixty-five to seventy (65-70) hours per week.

93.    For approximately one to two (1-2) weeks starting in or around August 1, 2020, when the restaurant reopened for the first time after the start of the pandemic, Plaintiff Lupachov typically worked four (4) days per week, from approximately 5:00 pm to 12:00 am, for a total of

approximately twenty-eight (28) hours per week. Subsequently, until in or around mid-December 2020, Plaintiff Lupachov worked five (5) days per week, from approximately 5:00 pm to 11:00 pm on weekdays, and from approximately 5:00 pm to 12:00 am on Fridays and Saturdays, for a total of approximately thirty-two (32) hours per week.

94.     From in or around mid-February 2021, when the restaurant reopened after a second pandemic-related shutdown, through in or around May 2021, Plaintiff Lupachov typically worked five (5) days per week, from approximately 5:00 pm to 11:00 pm on weekdays, and from approximately 5:00 pm to 12:00 am on Fridays and Saturdays, for a total of approximately thirty-two (32) hours per week.

95.     From in or around May 2021 through in or around August 2021, when the restaurant reopened for lunch, Plaintiff Lupachov typically worked five (5) days per week, from approximately 12:00 pm to 11:00 pm on Sundays, from approximately 6:00 pm to 11:00 pm on Wednesdays, Thursdays and Fridays, and from approximately 12:00 pm to between 11:00 pm and 12:00 am on Saturdays, for a total of approximately thirty-eight (38) hours per week.

96.     From in or around August 2021 through in or around November 2021, Plaintiff Lupachov typically worked five (5) days per week, from approximately 6:00 pm to between 10:30 pm and 11:00 pm on weekdays, and from approximately 6:00 pm to 12:00 am on Saturdays, for a total of approximately twenty-five to twenty-six (25-26) hours per week.

97.     From in or around November 2021 through the present, Plaintiff Lupachov has typically worked five to six (5-6) days per week, from approximately 12:00 pm to approximately 11:00 pm, for a total of approximately fifty-five to sixty-five (55-65) hours per week.

98.     During the relevant time period, Plaintiff Lupachov was frequently unable to take a break of any kind because the restaurant was busy.

99.     Throughout the Lupachov Employment Period, Plaintiff Lupachov has been paid the New York City tipped minimum wage for all hours for which he received compensation, plus tips. Thus, Plaintiff Lupachov was paid five dollars ($5.00) per hour from the start of the relevant time period to in or around December 2016, seven dollars and fifty cents ($7.50) per hour from in or around January 2017 through December 2017, eight dollars and seventy cents ($8.70) from in or around January 2018 through December 2018, and ten dollars per hour ($10.00) from in or around January 2019 through the present.

100.     On certain occasions during the Lupachov Employment Period, Osika and Acosta informed Lupachov that the Individual Defendants do not want to pay overtime premiums. This typically happened around the busier holiday season when Defendant G. Sherry reviewed employee hours and observed that many of Defendants' employees were working approximately fifty to sixty (50-60) hours per week, and sometimes more.

101.     On one occasion after the restaurant reopened in 2021, Plaintiff Lupachov received a phone call from Acosta who informed him that the Individual Defendants did not want to issue paychecks to employees showing more than twenty-nine (29) hours per week. Acosta additionally told Lupachov that he would keep track of the hours that Lupachov worked in excess of twenty (29) in a week and pay him for that time on separate checks.

102.     During the relevant time period, Plaintiff Lupachov noticed that management often clocked him out inaccurately such that there were ten to thirty (10-30) minutes, and sometimes as many as forty-five to sixty (45-60) minutes, missing from his shift in Defendants' P.O.S. system. When Lupachov asked Osika to correct the missing time, Osika often responded that he would add the extra time to a subsequent check "if he had room" (i.e., if Lupachov's check during a later pay period showed 39 hours or fewer).

103.    During the relevant time period, virtually any payment that Plaintiff Lupachov received for hours worked in excess of forty (40) hours, until in or around 2020, and twenty-nine (29) hours starting in or around 2021, was issued on a subsequent payroll check at straight time. As mentioned above, Defendants typically added certain additional hours to a later check only if the hours that Lupachov worked that week fell below the maximum number of hours that Defendants would allow to appear on employees' payroll checks (i.e., 40 hours prior to 2021 and 29 hours starting in 2021). Due to the limited number of additional hours for which Defendants agreed to compensate Lupachov on subsequent checks, Plaintiff Lupachov was not paid wages of any kind, much less overtime premiums, for numerous hours that he worked, particularly the substantial overtime hours accumulated during the busy holiday season.

104.    On several occasions, Plaintiff Lupachov received a second payroll check for hours worked in excess of forty (40) or twenty-nine (29) hours. For example, during the June 25, 2021 pay cycle, Lupachov received a payroll check showing payment for twenty-nine (29) hours at ten dollars ($10.00) per hour, plus the tips that Lupachov had earned that week, and a second check for thirty-two (32) hours paid at his regular hourly rate without tips.

105.    Plaintiff Lupachov recalls that Defendants typically began adding hours that employees accumulated during the busy holiday season in excess of the threshold amount that Defendants would allow on employees' paystubs in January of each year. As stated above, Defendants' accountant, Osika, would often inform Lupachov that he was only able to "fit" a certain number of additional hours on checks issued during later pay periods due to Defendants' policy of only paying for a certain number of hours on employees' payroll checks (i.e., 40 or 29 hours).

106.    On certain occasions during the Lupachov Employment Period, Plaintiff Lupachov

received one and one half (1.5) times his regular hourly rate for a limited number of overtime hours (e.g., 2-3 hours paid at overtime rates during a week that Lupachov performed 50 hours of work). However, as mentioned above, Plaintiff Lupachov did not receive overtime premiums for the vast majority of overtime hours that he worked during the relevant time period.

107.    On numerous occasions, Plaintiff Lupachov spoke with Defendants' accountant, Osika, about missing hours from his payment. During these discussions, Osika often informed Lupachov that Defendants M. Sherry and G. Sherry had instructed him to pay employees for no more than forty (40), and later twenty-nine (29), hours on their paychecks.

108.    **Plaintiff Radoncic** was employed by Defendants as a server from in or around August 2003 through the present (the "Radoncic Employment Period").

109.    From the start of the relevant time period to in or around March 2020, Plaintiff Radoncic typically worked two to three (2-3) lunch shifts and five (5) dinner shifts over the course of five (5) days per week, from approximately 11:00 am to between 9:30 pm and 11:00 pm when he worked both a lunch and dinner shift, and from approximately 4:00 pm to between approximately 11:00 pm and 12:00 am when he worked a single dinner shift, for a total of approximately thirty-five to forty-two (35-42) hours per week. Approximately once or twice per month, Plaintiff Radoncic was required to work an additional shift during the week, such that he worked between approximately forty-six (46) and forty-eight (48) hours during the week.

110.    During the busier holiday season (i.e., November and December of each year) prior to the pandemic, Plaintiff Radoncic typically worked five to seven (5-7) days per week, from approximately 12:00 pm to 10:30 pm Monday through Thursday, and approximately 12:00 pm through between 11:30 pm and 12:00 am on Fridays and Saturdays, for an average of approximately sixty-five (65) hours per week.

111.    From in or around August 2020 through in or around October 2020, after the restaurant reopened for the first time since the start of the pandemic, Plaintiff Radoncic typically worked four (4) days per week from approximately 3:00 pm to 11:00 pm, for a total of approximately thirty-six (36) hours per week. From in or around October 2020 through December 2020, Plaintiff Radoncic's schedule increased to five (5) days per week, such that he typically worked approximately forty (40) hours per week.

112.    From in or around February 2021 through April 2021, after the restaurant's second reopening, Plaintiff Radoncic typically worked two to four (2-4) days per week, from approximately 4:00 pm to between 10:00 pm and 10:30 pm, for an average of approximately twelve (12) and twenty (20) hours per week, and sometimes more.

113.    From in or around April 2021 through in or around May 2021, Plaintiff Radoncic typically worked three to four (3-4) days per week from approximately 4:00 pm to between 10:00 pm and 10:30 pm, for a total of approximately eighteen to twenty (18-20) hours per week, and sometimes more.

114.    From in or around early May 2021 through in or around October 2021, Plaintiff Radoncic typically worked three to four (3-4) days per week, from approximately 12:00 pm to between 9:00 pm and 9:30 pm when he worked both lunch and dinner, and from approximately 4:00 pm to between 9:00 pm and 10:30 pm when he worked a single dinner shift, for a total of approximately twenty-eight to thirty-two (28-32) hours per week.

115.    From in or around November 2021 through December 2021, Plaintiff Racondic typically worked four (4) days per week, from 6:00 pm to 10:00 pm when he worked a single dinner shift and from 12:00 pm or 1:00 pm to 10:00 pm when he worked both a lunch and dinner shift, for a total of approximately sixteen to twenty-eight (28) hours per week.

116.    From early December 2021 through the present, Plaintiff Radoncic has typically worked five (5) days per week, from 12:00 pm or 1:00 pm when he works both a lunch and a dinner shift, and from 5:00 pm to 10:00 pm when he works a single dinner shift, for a total of approximately thirty to thirty-nine (30-39) hours per week.

117.    During the relevant time period, Plaintiff Radoncic was frequently unable to take a break of any kind because the restaurant was busy.

118.    Throughout the Radoncic Employment Period, Plaintiff Radoncic has been paid the New York City tipped minimum wage for all hours for which he received compensation, plus tips. Thus, Plaintiff Radoncic was paid five dollars ($5.00) per hour from the start of the relevant time period to in or around December 2016, seven dollars and fifty cents ($7.50) per hour from in or around January 2017 through December 2017, eight dollars and seventy cents ($8.70) from in or around January 2018 through December 2018, and ten dollars per hour ($10.00) from in or around January 2019 through the present.

119.    On one (1) occasion in or around 2015 or 2016, Plaintiff Radoncic had a conversation with a manager, "George," during which Radoncic asked why he and his coworkers were not being paid for more than forty (40) hours on their paychecks. In response, "George" informed Radoncic that the Individual Defendants did not want to pay overtime because it was "too much money."

120.    On numerous occasions, Plaintiff Radoncic asked Acosta or the manager assigned to the floor for the shift why his payment did not include overtime premiums. Although these individuals sometimes informed Radoncic that they would "take care of it," Plaintiff Radoncic ultimately never received overtime premium pay of one and one-half (1.5) times his regular hourly rate for substantial hours that he worked in excess of forty (40) in a week.

121.    Similarly, on one (1) occasion shortly after the restaurant reopened for the second time in February 2021, Plaintiff Radoncic asked Acosta why he and certain of his coworkers were consistently working fewer than thirty (30) hours per week. Acosta explained that this directive had come straight from the Individual Defendants.

122.    During the relevant time period, Plaintiff Radoncic noticed that management failed to accurately record the hours that he worked such that the "period slip" generated from the Squirrel system showing the hours that Defendants had recorded for each of Radoncic's shifts was frequently missing approximately seven to ten (7-10) hours per week.

123.    On top of missing time due to Defendants' inaccurate timekeeping practices, Defendants typically paid Radoncic for a maximum of forty (40) hours on his paystubs prior to 2021 and a maximum of twenty-nine (29) hours starting in 2021, despite the fact that Radoncic often exceeded these thresholds. When Radoncic complained about missing hours from his payment to Osika and Acosta, which typically happened as often as one to two (1-2) times per month, Defendants generally added certain of the unpaid hours to a subsequent check at straight time rates during pay periods in which Defendants' records showed that Radoncic had worked fewer than the maximum number of hours Defendants would allow on employees' paychecks (i.e., 40 or 29 hours) or added the extra hours at Radoncic's regular hourly rate to a separate check, such that Radoncic received two (2) checks during the same pay period. However, Defendants typically did not add all of the hours that Radoncic worked above the threshold of twenty-nine (29) or forty (40) hours to subsequent payments, such that Radoncic was not paid wages of any kind of a substantial number of hours that he worked. For example, if Radoncic worked ten (10) hours of overtime during the week that did not appear on his paycheck for the applicable workweek, he might be paid for only four to five (4-5) of those ten (10) overtime hours on a subsequent paycheck

along with hours worked during a different pay period or on a separate check containing only the additional hours that he worked above the 40 or 29-hour threshold.

124.    On certain rare occasions during the Radoncic Employment Period, Plaintiff Radoncic received one and one-half (1.5) times his regular hourly rate for a limited number of overtime hours (e.g., 5-6 hours paid at overtime rates during a week that Radoncic worked 10 hours of overtime). However, as mentioned above, Plaintiff Radoncic did not receive overtime premiums for a substantial number of overtime hours that he worked during the relevant time period.

125.    On two to four (2-4) occasions during the relevant time period, after customers who had been seated in Radoncic's section complained that they had been overcharged, Acosta instructed Plaintiff Radoncic to pay the money back to Defendants. Specifically, managers held the amount lost from the incident from the tips of Radoncic and his front-of-the-house coworkers who worked that particular shift. Plaintiff Radoncic was ultimately never reimbursed for payouts he was required to make from his tips to account for customer walkouts or customers who were mistakenly under or overcharged.

**Defendants' Retaliation Against Plaintiffs Hakaj and Radoncic**

126.    From the start of the FLSA period (i.e., January 2019) through the present, Plaintiffs Hakaj and Radoncic have experienced numerous instances of retaliatory conduct from Defendants due to frequent complaints about missing hours from their payments and the resulting lack of overtime premium pay, the manner in which front-of-the-house employees were assigned work and Hakaj and Radoncic's efforts to pursue their claims against Defendants by seeking counsel from a wage-and-hour attorney regarding Defendants' wage violations.

127.    On several occasions starting in or around August or September 2020, around the

time that Plaintiffs Hakaj and Radoncic began speaking with counsel to set up an in-person meeting regarding their claims, Acosta began making comments to staff generally that he heard that Hakaj and Radoncic were thinking of suing Defendants and that employees who participated in any future litigation would be at risk of losing their jobs. Acosta also informed employees that Hakaj and Radoncic "think they can do whatever they want" and asked them to consider, "where is Sayed [Khalil, a named plaintiff who brought a wage-and-hour lawsuit against Defendants in 2007 and a related retaliation case in 2008] now?", insinuating that any individual who participated in a future lawsuit against Defendants would similarly face retaliation.

128.    On numerous occasions during the FLSA period, Acosta openly compared Plaintiff Hakaj to Khalil and encouraged employees not to "follow" Hakaj, as he was "making trouble" by asking to be paid for all of the hours that he worked and overtime premiums for hours worked in excess of forty (40) per week and not receiving job assignments in accordance with seniority.

129.    The same day that Plaintiff Radoncic met with the undersigned counsel for the first time on or about September 1, 2020, Acosta approached Radoncic as Radoncic was parking his car, told him that he was not able to sue Old Homestead directly because the restaurant was insured and informed him that he was not going to get more than three hundred to one thousand dollars ($300.00-$1,000.00) from any future lawsuit.

130.    On July 3, 2008, former employees Wayne Walker, Sayed Khalil and Brian LaHoff filed a complaint against The Original Homestead Restaurant, Inc., Gregory Sherry, Marc Sherry and Luis Acosta (*Walker, et al. v. The Original Homestead Restaurant, Inc., et al*., S.D.N.Y., Civil Action No. 08-cv-6117), alleging that the defendants "engaged in a campaign of intimidation, threats and coercion" against the plaintiffs after they exercised their right to initiate a lawsuit to recover unpaid wages and tips. Specifically, the *Walker* lawsuit alleged that Old Homestead's

28

management and owners "engaged in a campaign of retaliation, intimidation and disparate treatment towards waiters who joined the FLSA lawsuit, designed to cause plaintiffs to quit their jobs as waiters at Old Homestead," by assigning the plaintiffs "traditionally less desirable customers" giving plaintiffs fewer customers per shift, failing to send customers to their stations until well after their coworkers were permitted to start their shifts and encouraging servers who did not participate in the lawsuit to "make plaintiffs' working conditions uncomfortable." The *Walker* complaint also alleged that plaintiffs were "criticized, scrutinized and unfairly disciplined for conduct that other waiters were not disciplined for" and that Acosta told plaintiffs that "he does not know why there are still working at Old Homestead," as "they should go work somewhere else." The *Walker* complaint further alleged that Acosta warned the kitchen manager to "be careful," as "very bad people are working here," meaning plaintiffs. The plaintiffs additionally alleged that Defendant M. Sherry and Acosta accosted them after taking a grievance to their union, Local 100 for "creat[ing] a lot of problems" in the restaurant. Finally, M. Sherry and G. Sherry held a meeting with Khalil and Walker during which they encouraged Khalil and Walker to leave the restaurant and sent them barely any customers that night, thus suggesting that if they continued to work at Old Homestead, "they would not be allowed to make a decent living." Old Homestead terminated LaHoff's employment by letter, "based on the trumped up allegations that LaHoff was 'abuse' to patrons and that LaHoff engaged in 'dishonesty' when he allegedly entered at twenty-eight dollar tip into the computer rather than the twenty-seven dollar tip the customer had indicated on his bill."

131.    Due to the 2008 retaliation complaint, which named the same defendants as the present matter and was litigated until on or about December 14, 2010, Defendants knew or should have known that their conduct against Plaintiffs Hakaj and Radoncic violated the retaliation

provisions of the FLSA and NYLL.

132.   Within the applicable limitations period, Defendants repeatedly failed to assign customers to Hakaj and Radoncic's respective stations, assigned them to sections of the restaurant that received fewer customers (e.g., the back of the restaurant or the "Library Room," a secluded private dining room) and called other servers to work lucrative private events or holiday shifts, despite the fact that these individuals were typically less senior than Hakaj and Radoncic.

133.   On numerous occasions following complaints about failure to pay for all hours worked or overtime premiums of one and one-half (1.5) times their regular hourly rates, Old Homestead assigned Plaintiffs Hakaj and Radoncic as few as one (1) or two (2) tables per shift.

134.   Defendants' managers additionally often prohibited Hakaj and Radoncic from starting work until well after they arrived at the restaurant (e.g., not allowing them to start taking customers until 6:00 pm if they arrived at the restaurant at 5:00 pm or 5:30 pm for a dinner shift), despite the fact that there were open tables in their sections and other servers were permitted to start serving dinner as early as 4:00 pm.

135.   On or about August 27, 2020, Acosta handed Plaintiff Hakaj a letter from Defendant M. Sherry when Hakaj arrived for his shift, which accused Hakaj of displaying "improper behavior" and a "lack of respect for management," "creating a combative atmosphere with other Old Homestead employees," and "not following proper social distancing as instructed." The letter further stated that "if this behavior does not immediately cease, [Hakaj] will be disciplined and immediately suspended." Upon information and belief, Hakaj received this letter in response to discussions with coworkers about the possibility of bringing a lawsuit against Defendants to recover unpaid wages, among other damages and in advance of an in-person meeting with counsel that was scheduled for September 1, 2020, about which he had communicated with

coworkers.

136.    Shortly after Plaintiff Hakaj received the August 27, 2020 letter, another server, Nelson Cruz, informed Hakaj that Old Homestead's attorney, Amanda M. Fugazy, had contacted him and asked him to provide a statement in support of the letter's accusation regarding Plaintiff Hakaj's supposed disrespectful attitude towards restaurant management, which Cruz declined to provide. Upon information and belief, Defendants asked Fugazy to reach out to Cruz in an attempt to build a case against Plaintiff Hakaj due to his discussions with other employees about the possibility of speaking with a wage-and-hour attorney to commence a lawsuit against Defendants.

137.    On at least two (2) occasions in 2021, management additionally assigned tables in Hakaj's station to bartenders and allowed them to continue serving customers in Hakaj's station after Hakaj had arrived for his shift, thus limiting the number of customers that he was able to serve.

138.    On several occasions during the FLSA period, Plaintiff Hakaj complained to Acosta and other managers about the fact that he was routinely passed over for work, not assigned as many customers as other servers and not permitted to start serving dinner as early as other servers who were less senior. On these occasions, Acosta typically instructed the maître d or the manager on the floor to freeze Hakaj's station and not assign him any more customers.

139.    On at least several occasions in 2021, Plaintiff Hakaj complained to Acosta that he did not want to go home with $150.00 for the night, while others were earning $500.00 to $700.00 or more due to the retaliatory manner in which Defendants distributed work assignments and customers. Acosta simply responded that he would "take care of it." On or about October 18, 2021, Hakaj was again passed over to work a private event for which the restaurant specially opened on a Monday.

140.     Similarly, on several occasions during the FLSA period, after Plaintiff Radoncic issued complaints to management about other servers earning six hundred dollars to seven hundred dollars ($600.00-$700.00) per night, he would routinely end up in a similar or worse situation the following shift (i.e., assigned to work in a less busy section of the restaurant or assigned very few customers), despite the fact that Acocta typically assured him that "tomorrow will be different." As described above, during the winter holiday season of 2021, Radoncic worked far fewer hours than he had previous years, while other servers were assigned to many of the shifts that should have gone to Radoncic due to seniority. Plaintiff Radoncic was also passed over to work a private event for which the restaurant opened specifically on a Monday on or about October 18, 2021, instead calling upon three (3) servers who were less senior than Radoncic.

141.     On at least a couple of occasions in or around fall 2021, managers stopped assigning Radoncic customers altogether after Radoncic complained that he was being assigned to less desirable sections of the restaurant with fewer customers such that he was earning significantly less in tips than other servers.

142.     On one occasion in or around 2019, a customer left a false negative review about Plaintiff Hakaj on OpenTable, presumably due to an incident where Hakaj informed the customer that another server would be taking care of her party after she snapped at him when he attempted to take her order. Although the review was relatively mild (accusing Hakaj of being "rough around the edges" and bumping into one of her guests' chairs), Defendant M. Sherry and Acosta demanded a meeting with Hakaj shortly after the review was published. During the meeting, M. Sherry asked Hakaj why he would treat his customer in the manner described in the review. Hakaj responded that it was not his intention to hurt the customer or Defendants' business, to which M. Sherry ominously replied, "Henry [a nickname for Plaintiff Hakaj], do you know I'm going to hurt you?"

Plaintiff Hakaj is aware that other servers who received negative reviews were not similarly threatened or reprimanded.

143.    The aforementioned retaliatory acts are ongoing and have happened routinely over the past three (3) years.

144.    Upon information and belief, the Individual Defendants and Defendants' managers have embarked on a campaign to discourage others from participating in the present lawsuit. Around the time that Plaintiffs Hakaj and Radoncic first met with counsel in or around early September 2020, Plaintiff Radoncic heard from coworkers that Acosta had informed them that they were "not going to get anything" as a result of the lawsuit, referred to the allegations as "bullshit," and called out Plaintiffs Hakaj and Radoncic by name as the ringleaders.

**Defendants' Unlawful Corporate Policies**

145.    Throughout the relevant time period, Plaintiffs and the Class Members were frequently required to continue working beyond the restaurant's listed closing time to wait for customers to finish their meals, perform side work, prepare reports for managers regarding daily sales and the amounts received in tips and change their clothes.

146.    Plaintiffs and the Collective and Class Members were all paid pursuant to the same corporate policies of Defendants, including failing to pay minimum wages, overtime premiums, and spread-of-hours premiums.

147.    Due to Defendants' routine failure to compensate employees for all hours that they worked and improper use of the tip credit, Plaintiffs regularly received less than the applicable minimum wage for all hours that they worked during the week.

148.    Throughout their respective employment periods, Plaintiffs were also not paid overtime premiums of one and one-half (1.5) times their regular hourly rate for substantial hours

worked over forty (40) each workweek.

149.    Plaintiffs have spoken with other employees of Defendants who were similarly paid below minimum wage and did not receive overtime premiums of one and one-half (1.5) times their regular hourly rate for all hours worked in excess of forty (40) in a week. Defendants' failure to pay Plaintiffs minimum wages for all hours worked and overtime premiums for hours worked in excess of forty (40) per workweek is and has been a corporate policy of Defendants which has applied to all of their non-management employees throughout the Class Period.

150.    During the relevant time period, Defendants engaged in practices that ultimately discounted the total number of hours for which Plaintiffs and the Collective and Class Members were paid, including inaccurately clocking employees in and out, only paying employees up to a certain threshold number of hours (i.e., 40 or 29 hours) on their weekly paystubs and paying certain employees for only a limited number of hours worked in excess of the 40 or 29-hour threshold on subsequent payroll checks.

151.    Upon information and belief, during the relevant time period, the Individual Defendants instructed certain managers to adjust employees' clock-in and/or clock-out times in the Squirrel system to keep employee hours at or under forty (40) in a week. At the end of the shift, Defendants' managers, per the instructions of the Individual Defendants, adjusted employees' hours if they started working before their scheduled shift time (i.e., if they were called to work early because the restaurant was experiencing a busy period) or ended work after the end of their scheduled shift.

152.    Upon information and belief, Defendants' back-of-the-house employees similarly received paystubs showing no more than forty (40) or twenty-nine (29) hours and occasionally received payment for hours worked in excess of those thresholds in cash or on a separate check.

153.    During the relevant time period, Defendants' managers completely blocked employees' ability to clock in and/or out using Defendants' P.O.S. system or clocked employees in or out themselves, often inaccurately.

154.    During the relevant period, Defendants' managers or maître ds often clocked employees in and/or out inaccurately (i.e., after employees started their shifts or before they left for the night) such that Defendants' records of the hours that employees worked were artificially low.

155.    On certain occasions, managers clocked in only one server for the shift such that the rest of the servers scheduled for that shift worked under that individual's name in an effort to simplify paperwork for Defendants' accountant. Thus, if the servers who were not clocked in left before the server under whose name they were working, managers would be left to guess the end time of servers' shifts.

156.    Upon information and belief, managers or assistant managers often punched out kitchen employees when the manager's shift ended, despite the fact that many employees were still working in the kitchen and had not completed their shifts. This practice frequently resulted in kitchen employees losing twenty to thirty (20-30) minutes per day, and sometimes more, from Defendants' recorded hours, such that the records from the P.O.S. system reflected fewer hours than they worked.

157.    As mentioned above, the "period slips" generated from the Squirrel system were frequently inaccurate and reflected the times that managers or maître ds clocked employees in and out.

158.    Regardless of the number of hours that appeared in Defendants' P.O.S. system, Defendants paid routinely employees for a maximum of forty (40) hours, prior to 2021, and

twenty-nine (29) hours, starting in 2021, on their weekly paychecks despite the fact that they often exceeded these thresholds. Although certain employees, including Plaintiffs Lupachov and Radoncic received payment for certain hours worked in excess of the threshold amount on subsequent checks in a later payroll period than those hours were accumulated, Plaintiffs and their similarly situated coworkers were ultimately not paid wages of any kind of a substantial number of hours that they worked.

159.     As restaurant workers, Plaintiffs were entitled to be paid on a weekly basis, no later than seven (7) days at the end of each workweek. Thus, Plaintiffs and the Class Members are entitled to damages for unreasonably delayed payment of wages.

160.     Upon information and belief, starting in 2021, Defendants provided paystubs to Plaintiffs and the Class Members showing no more than twenty-nine (29) hours per week, regardless of whether they exceeded that threshold, in order to artificially keep employees' weekly payroll records below the thirty (30)-hour mark at which Defendants were required to make welfare contributions per Old Homestead's CBA with Local 100 (Hotel Employees & Restaurant Employees International Union).

161.     From the start of the relevant time period to in or around 2017, Plaintiffs and Defendants' other front-of-the-house employees were required to attend a daily pre-shift meeting fifteen (15) minutes prior to the start of the shift.  After 2017, these meetings typically only took place when management wanted to discuss a particular one-off topic with Defendants' employees (e.g., price changes, specials or addressing a customer complaint). On days when Defendants' employees were required to attend pre-shift meetings, managers typically clocked them in at the time that their shift was scheduled to start such that they were not able to record the time that they spent participating in mandatory meetings. Plaintiffs are additionally aware that certain front-of-

the-house employees were sent home without pay if they arrived late to these meetings.

162.    Despite the fact that Plaintiffs and the Class Members regularly worked shifts in excess of ten (10) hours, they were not paid spread-of-hours premiums for such days.

163.    Defendants' failure to pay Plaintiffs spread-of-hours premiums for days in which they worked a spread of more than ten (10) hours and/or a split shift is and has been a corporate policy which applies to all of their non-management employees who worked more than ten (10) hours in a day and/or a split shift throughout the Class Period.

164.    On or about October 10, 2016, employee benefits and payroll platform BenefitMall sent an e-mail to Osika through Old Homestead's accounts payable e-mail address regarding "pay stub updates." Specifically, BenefitMall's e-mail stated that the "primary change to your [i.e., Old Homestead's] pay stub is a new informational line labeled as "TipCr Memo." The e-mail continues, "the tip credit memo is required on each hourly rate that is less than the state minimum wage. As a result, the pay stubs will reflect a memo line for each earning." Prior to late 2016, Plaintiffs' and the Class Members' paystubs did not contain a breakdown of the amount that Defendants were taking as a tip credit towards Old Homestead's minimum wage obligations, and Plaintiffs and the Tipped Subclass Members did not receive a written notice or any written or verbal explanation that Defendants were taking the tip credit in calculating their hourly rate.

165.    As mentioned above, during the relevant time period, Defendants failed to keep accurate records of the hours worked by Plaintiffs to ensure that the tipped employees earned at least enough in tips to equal to amount of the tip credit being taken.

166.    During the relevant time period, Plaintiffs and Defendants' other servers were required to pay the bartenders and bussers entirely in cash. Thus, if Plaintiffs ended their shift with only credit card tips, which occurred frequently, they were required to come up with the cash from

their personal funds.

167.   As mentioned above, during the relevant time period, Defendants occasionally required Plaintiffs and their other servers to pay back Defendants when they inadvertently overcharged or undercharged a customer, or the customer walked out with paying the bill, such that the restaurant either did not receive the full amount of the bill or had to issue a refund to a customer. Specifically, managers held the amounts lost from these incidents from the tips of the servers who worked that particular shift. For example, if a customer walked out without paying a $200.00 bill, and four (4) servers worked during the shift that the walkout occurred, managers would improperly hold the full $200.00 ($50.00 per server) from the servers' tips. Thus, Defendants' servers were ultimately never reimbursed for numerous payouts they were required to make from their tips to account for customer walkouts or customers who were mistakenly under or overcharged.

168.   To be eligible for the tip credit, employers of tipped personnel must allow employees to keep all of the tips that they receive. Because Defendants routinely violated the requirements for taking the tip credit (i.e., by failing to provide proper notice, holding servers' tips to make up for customer walkouts or billing errors and failing to keep accurate records of the hours that Defendants' tipped employees worked), Defendants were not entitled to pay Plaintiffs or their other tipped employees the New York "tipped" minimum wage and instead were obligated to pay Plaintiffs and the Tipped Subclass Members the full statutory minimum wage.

169.   Because the paystubs that Plaintiffs and the Class Members received did not contain an accurate accounting of the number of hours that they worked during the pay period, Defendants did not provide Plaintiffs and the Class Members with a proper wage statement during the relevant time period.

170.     Throughout the Class Period and, upon information and belief, continuing until today, Defendants have likewise employed other individuals like Plaintiffs in positions that require little skill and no capital investment. Upon information and belief, such individuals were required to work for less than minimum wage and were not paid overtime premiums when working in excess of forty (40) hours per week.

171.     Additionally, such individuals were not provided spread-of-hours premiums while working shifts in excess of ten (10) hours, nor were they provided with proper wage notices at hiring or before a change in wage rate, or proper wage statements with their wage payments on a weekly basis.

172.     Upon information and belief, throughout the Class Period and continuing until today, Defendants failed to maintain accurate and sufficient time and payroll records or provide such records to employees.

173.     From in or around August 2020 through December 2020 and again from in or around February 2021 through the present, Defendants have been taking union dues (i.e., $50.00 per month) and pension contributions from Plaintiffs' and the Class Members' payments, despite the fact that Plaintiffs Lupachov and Hakaj had conversations with union representatives in which the union disclosed that Defendants had not been making contributions to the union fund.

**FIRST CAUSE OF ACTION**
**FAIR LABOR STANDARDS ACT – UNPAID MINIMUM WAGE**
**(Brought on Behalf of Plaintiffs and the Collective Action Members)**

174.     Plaintiffs, on behalf of themselves and the Collective Action Members, repeat and reallege each and every allegation of the preceding paragraphs hereof with the same force and effect as though fully set forth herein.

175.    By failing to pay minimum wages for all hours worked, Defendants have violated and continue to violate the FLSA, 29 U.S.C. §§ 201 *et seq.*, including 29 U.S.C. §§ 206 and 215(a)(2).

176.    The foregoing conduct, as alleged, constitutes a willful violation of the FLSA within the meaning of 29 U.S.C. § 255(a).

177.    Defendants' failure to pay minimum wages for all hours worked caused Plaintiffs and the Collective Action Members to suffer loss of wages and interest thereon.

178.    By failing to notify Plaintiffs and Defendants' other tipped employees that they were relying on the tip credit in calculating employees' hourly rates, Defendants lose the ability to utilize a tip credit against the FLSA's minimum wage.

179.    Plaintiffs and the Collective Action Members are entitled to recover from Defendants their full unpaid minimum wages, damages for unreasonably delayed payment of wages, liquidated damages, reasonable attorneys' fees, and costs and disbursements of the action pursuant to 29 U.S.C. § 216(b).

**SECOND CAUSE OF ACTION**
**FAIR LABOR STANDARDS ACT – UNPAID OVERTIME**
**(Brought on Behalf of Plaintiffs and the Collective Action Members)**

180.    Plaintiffs, on behalf of themselves and the Collective Action Members, repeat and reallege each and every allegation of the preceding paragraphs hereof with the same force and effect as though fully set forth herein.

181.    By failing to pay overtime at a rate not less than one and one-half (1.5) times the regular rate of pay for work performed in excess of 40 hours per week, Defendants have violated and continue to violate the FLSA, 29 U.S.C. §§ 201 *et seq.*, including 29 U.S.C. §§ 207(a)(1) and 215(a)(2).

182.   The foregoing conduct, as alleged, constitutes a willful violation of the FLSA within the meaning of 29 U.S.C. § 255(a).

183.   Defendants' failure to pay overtime caused Plaintiffs and the Collective Action Members to suffer loss of wages and interest thereon. Plaintiffs and the Collective Action Members are entitled to recover from Defendants their unpaid overtime premium compensation, damages for unreasonably delayed payment of wages, liquidated damages, reasonable attorneys' fees, and costs and disbursements of the action pursuant to 29 U.S.C. § 216(b).

**THIRD CAUSE OF ACTION**
**NEW YORK LABOR LAW – UNPAID MINIMUM WAGE**
**(Brought on Behalf of Plaintiffs and the Class Members)**

184.   Plaintiffs, on behalf of themselves and the Class Members, repeat and reallege each and every allegation of the preceding paragraphs hereof with the same force and effect as though fully set forth herein.

185.   Defendants willfully violated Plaintiffs' and Class Members' rights by failing to pay minimum wage for all hours worked, in violation of the NYLL and regulations promulgated thereunder.

186.   Defendants' failure to pay minimum wage for all hours worked caused Plaintiffs and the Class Members to suffer loss of wages and interest thereon.

187.   Plaintiffs and the Class Members are entitled to recover from Defendants their unpaid minimum wages, damages for unreasonably delayed payment of wages, liquidated damages, reasonable attorneys' fees, and costs and disbursements of the action pursuant to NYLL §§ 663(1) *et seq.*

**FOURTH CAUSE OF ACTION**
**NEW YORK LABOR LAW – UNPAID OVERTIME**
**(Brought on Behalf of Plaintiffs and the Class Members)**

188.   Plaintiffs, on behalf of themselves and the Class Members, repeat and reallege each and every allegation of the preceding paragraphs hereof with the same force and effect as though fully set forth herein.

189.   Defendants willfully violated Plaintiffs' and the Class Members' rights by failing to pay overtime compensation at a rate of not less than one and one-half (1.5) times the regular rate of pay for hours worked in excess of 40 each week, in violation of the NYLL and regulations promulgated thereunder.

190.   Defendants' failure to pay overtime premium compensation caused Plaintiffs and the Class Members to suffer loss of wages and interest thereon. Plaintiffs and the Class Members are entitled to recover from Defendants their unpaid overtime compensation, damages for unreasonably delayed payment of wages, liquidated damages, reasonable attorneys' fees, and costs and disbursements of the action pursuant to NYLL §§ 663(1) *et seq.*

### FIFTH CAUSE OF ACTION
### NEW YORK LABOR LAW – UNPAID SPREAD-OF-HOURS PREMIUMS
#### (Brought on Behalf of Plaintiffs and the Class Members)

191.   Plaintiffs, on behalf of themselves and the Class Members, repeat and reallege each and every allegation of the preceding paragraphs hereof with the same force and effect as though fully set forth herein.

192.   Defendants willfully violated Plaintiffs' and the Class Members' rights by failing to pay compensation in an amount equal to one hour's pay at the relevant minimum wage in all instances where the Class Members worked either a split shift or more than ten (10) hours per day, in violation of the New York Labor law and the regulations promulgated thereunder, N.Y. Comp. Code R. & Regs. tit. 12, §§ 137-1.7 (2010), 146-1.6 (2012).

193.    Defendants' failure to pay spread-of-hours compensation caused Plaintiffs and the Class Members to suffer loss of wages and interest thereon. Plaintiffs and the Class Members are entitled to recover from Defendants their unpaid spread-of-hours compensation, damages for unreasonably delayed payment of wages, liquidated damages, reasonable attorneys' fees and costs and disbursements of the action pursuant to NYLL §§ 663(1) *et seq.*

## SIXTH CAUSE OF ACTION
## NEW YORK LABOR LAW – FAILURE TO PAY WAGES
### (Brought on Behalf of Plaintiffs and the Class Members)

194.    Plaintiffs, on behalf of themselves and the Class Members, repeat and reallege each and every allegation of the preceding paragraphs hereof with the same force and effect as though fully set forth herein.

195.    Pursuant to NYLL § 191 and the cases interpreting same, workers such as Plaintiffs and the Class Members are entitled to be paid all their weekly wages "not later than seven calendar days after the end of the week in which wages are earned." Thus, Defendants violated NYLL § 191 by failing to pay Plaintiffs all of their wages earned within the week such wages were due.

196.    Pursuant to NYLL § 193, "No employer shall make any deduction from the wages of an employee," such as Plaintiffs and the Class Members, that is not otherwise authorized by law or by the employee.

197.    By withholding wages and overtime compensation from Plaintiffs, pursuant to NYLL § 193 and the cases interpreting same, Defendants made unlawful deductions in wages owed to Plaintiff.

198.    Defendants' failure to pay Plaintiffs wages of any kind for substantial hours that they worked in excess of the threshold amounts (i.e., 40 or 29) hours that Defendants would allow on employees' paystubs, violated NYLL §§ 191 and 193.

199.    Defendants' failure to comply with NYLL §§ 191 and 193 caused Plaintiffs and the Class Members to suffer loss of wages and interest thereon. Plaintiffs and the Class Members are entitled to recover from Defendants their unpaid wages, damages for unreasonably delayed payment of wages, liquidated damages, reasonable attorneys' fees, and costs and disbursements of the action pursuant to NYLL §§ 663(1) *et seq.*

**SEVENTH CAUSE OF ACTION**
**<u>NEW YORK LABOR LAW – FAILURE TO PROVIDE WAGE STATEMENTS</u>**
**(Brought on Behalf of Plaintiffs and the Class Members)**

200.    Plaintiffs, on behalf of themselves and the Class Members, repeat and reallege each and every allegation of the preceding paragraphs hereof with the same force and effect as though fully set forth herein.

201.    Defendants have willfully failed to supply Plaintiffs and Class Members with an accurate statement of wages as required by NYLL, Article 6, § 195(3), containing the dates of work covered by that payment of wages; name of employee; name of employer; address and phone number of employer; rate or rates of pay and basis thereof, whether paid by the hour, shift, day, week, salary, piece, commission, or other; gross wages; hourly rate or rates of pay and overtime rate or rates of pay if applicable; the number of hours worked, including overtime hours worked if applicable; deductions; and net wages.

202.    Due to Defendants' violations of the NYLL, Plaintiffs and the Class Members are entitled to recover from Defendants two hundred and fifty dollars ($250.00) per employee for each day that the violations occurred or continue to occur, up to a maximum of five thousand dollars ($5,000.00) per employee, as provided for by NYLL, Article 6, §§ 190 *et seq.*, liquidated damages as provided for by the NYLL, reasonable attorneys' fees, costs, pre-judgment and post-judgment interest, and injunctive and declaratory relief.

44

## EIGHTH CAUSE OF ACTION
## NEW YORK LABOR LAW – UNLAWFUL WITHHOLDING OF GRATUITIES
### (Brought on Behalf of Plaintiffs Hakaj, Lupachov and Radoncic and the Tipped Subclass Members)

203.   Plaintiffs Hakaj, Lupachov and Radoncic, on behalf of themselves and the Tipped Subclass Members, repeat and reallege each and every allegation of the preceding paragraphs hereof with the same force and effect as though fully set forth herein.

204.   Defendants have willfully failed to compensate Plaintiffs Hakaj, Lupachov and Radoncic and the Tipped Subclass Members for all gratuities earned by withholding a portion of gratuities left by patrons for Plaintiffs Hakaj, Lupachov and Radoncic and the Tipped Subclass, in violation of § 196-d of the New York Labor Law. Accordingly, Defendants are required to compensate Plaintiffs Hakaj, Lupachov and Radoncic and the Tipped Subclass Members for all gratuities withheld by Defendants.

205.   Due to the Defendants' New York Labor Law violations, Plaintiffs Hakaj, Lupachov and Radoncic and the Tipped Subclass Members are entitled to recover from Defendants their unpaid gratuities, damages for unreasonably delayed payment of wages liquidated damages, reasonable attorneys' fees, and costs and disbursements of the action pursuant to NYLL §§ 663(1) *et al.*, 196-d.

## NINTH CAUSE OF ACTION
## RETALIATION IN VIOLATION OF FLSA
### (Brought on behalf of Plaintiffs Hakaj and Radoncic)

206.   Plaintiffs Hakaj and Radoncic repeat and reallege each and every allegation of the preceding paragraphs hereof with the same force and effect as though fully set forth herein.

207.   Plaintiffs Hakaj and Radoncic attempted to enforce their rights pursuant to the FLSA by issuing complaints to management regarding significant unpaid hours and lack of overtime premiums and ultimately reaching out to a wage-and-hour attorney to discuss the

possibility of filing a lawsuit against Defendants to recover unpaid wages.

208.    Plaintiff Hakaj and Radoncic's actions were protected activity under the FLSA.

209.    Defendants retaliated against Plaintiffs Hakaj and Radoncic by repeatedly failing to assign customers to their respective stations, delaying the time at which they were permitted to start serving customers and failing to call them to work private events and additional shifts, despite the fact that they had seniority over the vast majority of Defendants' other servers.

210.    By the acts described here, and other acts, which are ongoing as of the filing of this Complaint, Defendants have harassed and reduced the income of Hakaj and Radoncic, thus violating the FLSA, 29 U.S.C. §§ 201 *et seq.*, including 29 U.S.C. §§ 215(a)(3).

211.    Plaintiffs Hakaj and Radoncic have suffered damages, including but not limited to loss of wages, punitive damages and interest.

212.    As a result of Defendants' conduct, Plaintiffs Hakaj and Radoncic are entitled to monetary relief, including but not limited to compensatory and other damages, reasonable attorneys' fees and costs, punitive damages, and other appropriate relief.

### TENTH CAUSE OF ACTION
### RETALIATION IN VIOLATION OF NYLL
#### (Brought on behalf of Plaintiffs Hakaj and Radoncic)

213.    Plaintiffs Hakaj and Radoncic repeat and reallege each and every allegation of the preceding paragraphs hereof with the same force and effect as though fully set forth herein.

214.    Plaintiffs Hakaj and Radoncic attempted to enforce their rights pursuant to the NYLL by issuing complaints to management regarding significant unpaid hours and lack of overtime premiums and ultimately reaching out to a wage-and-hour attorney to discuss the possibility of filing a lawsuit against Defendants to recover unpaid wages.

215.    Plaintiffs Hakaj and Radoncic's actions were protected activity under NYLL § 215.

216.    Defendants retaliated against Plaintiffs Hakaj and Radoncic by repeatedly failing to assign customers to their respective stations, delaying the time at which they were permitted to start serving customers and failing to call them to work private events and additional shifts, despite the fact that they had seniority over the vast majority of Defendants' other servers.

217.    By the acts described here, and other acts, which are ongoing as of the filing of this Complaint, Defendants have harassed and reduced the income of Hakaj and Radoncic, thus violating the NYLL § 215.

218.    Plaintiffs Hakaj and Radoncic have suffered damages, including but not limited to loss of wages, punitive damages and interest.

219.    As a result of Defendants' conduct, Plaintiffs Hakaj and Radoncic are entitled to monetary relief, including but not limited to compensatory and other damages, reasonable attorneys' fees and costs, punitive damages, and other appropriate relief.

## PRAYER FOR RELIEF

Wherefore, Plaintiffs, on behalf of themselves and all other similarly situated Collective Action Members, Class Members and Tipped Subclass Members, respectfully request that this Court grant the following relief:

a.    Designation of this action as a collective action on behalf of the Collective Action Members and ordering the prompt issuance of notice pursuant to 29 U.S.C. § 216(b) to all similarly situated members of an FLSA Opt-In Class, apprising them of the pendency of this action, permitting them to assert timely FLSA claims in this action by filing individual Consents to Sue pursuant to 29 U.S.C. § 216(b) and appointing Plaintiffs and their counsel to represent the Collective Action Members;

b.      Certification of this action as a class action pursuant to Fed. R. Civ. P. 23(a), (b)(2) and (b)(3) on behalf of the Class Members and Tipped Subclass Members and appointing Plaintiffs and their counsel to represent the Class and the Tipped Subclass;

c.      An order tolling the statute of limitations;

d.      A declaratory judgment that the practices complained of herein are unlawful under the FLSA and the NYLL;

e.      An injunction against Defendants and its officers, agents, successors, employees, representatives and any and all persons acting in concert with Defendants, as provided by law, from engaging in each of the unlawful practices, policies and patterns set forth herein;

f.      An award of compensatory damages as a result of Defendants' failure to pay minimum wage and overtime compensation pursuant to the FLSA and the NYLL and supporting regulations;

g.      An award of liquidated and/or punitive damages as a result of the Defendants' willful failure to pay minimum wages and overtime compensation pursuant to the FLSA and the NYLL and supporting regulations;

h.      An award of compensatory and liquidated damages as a result of Defendants' failure to pay all wages to which Plaintiffs and the Class Members are entitled, pursuant to the NYLL and supporting regulations;

i.      An award of actual and liquidated damages for the non-payment of spread-of-hours pay for each split shift and/or shift worked in New York in excess of ten (10) hours;

j.      Two hundred and fifty dollars ($250.00) per Plaintiff and each of the Class Members for each day that the violations of NYLL, Article 6 § 195(3) occurred or continue to occur, up to a maximum of five thousand dollars ($5,000.00) per Plaintiff and each of the Class Members, as provided for by NYLL, Article 6 § 198(1)-d;

k.      An award of damages arising out of the non-payment of gratuities;

l.      An award of liquidated damages arising out of the non-payment of gratuities;

m.      An award of compensatory damages for the economic damages and emotional distress, pain and suffering caused by Defendants' retaliation against Plaintiffs Hakaj and Radoncic;

n.      An award of punitive damages under the FLSA for retaliation;

o.      An award of punitive damages under the NYLL for retaliation;

p.      An award of prejudgment and post-judgment interest;

q.      An award of costs and expenses of this action together with reasonable attorneys' and expert fees; and

r.      Such other and further relief as this Court deems just and proper.

## DEMAND FOR TRIAL BY JURY

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs demand a trial by jury on all questions of fact raised by the complaint.

Dated: New York, New York
        January 13, 2022

                                        Respectfully submitted,

                                        **PELTON GRAHAM LLC**

By: _____

Brent E. Pelton (BP 1055)
pelton@peltongraham.com
Taylor B. Graham (TG 9607)
graham@peltongraham.com
111 Broadway, Suite 1503
New York, New York 10006
Telephone: (212) 385-9700
Facsimile: (212) 385-0800

*Attorneys for Plaintiffs and the putative*
*FLSA Collective and Class*

**Notice of Shareholder Liability for Services Rendered**
**Pursuant to § 630 of the Business Corporation Law of New York**

Pursuant to the provisions of § 630 of the Business Corporation Law of New York ("NYBCL"), the ten (10) largest shareholders of THE ORIGINAL HOMESTEAD RESTAURANT, INC. are hereby notified that the plaintiffs in this matter, individually and on behalf of the putative FLSA collective and the Class they seek to represent, intend to enforce your personal liability, as the ten (10) largest shareholders of THE ORIGINAL HOMESTEAD RESTAURANT, INC. and to charge you with indebtedness of said corporations to the plaintiffs for services performed for the corporations as employees during the six (6)-year period preceding the filing of the complaint.

Services for the above-referenced corporation were terminated by plaintiffs within the past 180 days.

Dated: January 13, 2022

Brent E. Pelton, Esq.

*Attorneys for Plaintiffs and the putative*
*FLSA Collective and Classes*

51

Page **6** of **6**

## CONSENT TO BECOME PARTY PLAINTIFF

By my signature below, I hereby authorize the filing and prosecution of claims in my name and on my behalf to contest the failure of Old Homestead Steakhouse and/or its respective owners, affiliated companies, subsidiaries, contractors, directors, officers, franchisees and/or affiliates to pay me minimum wages and overtime wages as required under state and/or federal law, and also authorize the filing of this consent in the action(s) challenging such conduct. I authorize being **named as the representative plaintiff** in this action to make decisions on behalf of all other plaintiffs concerning the litigation, the method and manner of conducting this litigation, the entering of an agreement with Plaintiff's counsel concerning attorneys' fees and costs, and all other matters pertaining to this lawsuit. I understand that I will be represented by Pelton Graham LLC without prepayment of costs or attorneys' fees. I understand that if plaintiffs are successful, costs expended by attorneys on my behalf will be deducted from my settlement or judgment first. I understand that my attorneys may petition the court for an award of fees and costs to be paid by defendants on my behalf. I understand that the fees retained by the attorneys will be either the amount received from the defendants or approximately 1/3 (33.33%) of my total settlement or judgment amount (including fees), whichever is greater.

Signature

ORHAN HAXAJ

Printed Name

www.PeltonGraham.com

## CONSENT TO BECOME PARTY PLAINTIFF

By my signature below, I hereby authorize the filing and prosecution of claims in my name and on my behalf to contest the failure of Old Homestead Steakhouse and/or its respective owners, affiliated companies, subsidiaries, contractors, directors, officers, franchisees and/or affiliates to pay me minimum wages and overtime wages as required under state and/or federal law, and also authorize the filing of this consent in the action(s) challenging such conduct. I authorize being **named as the representative plaintiff** in this action to make decisions on behalf of all other plaintiffs concerning the litigation, the method and manner of conducting this litigation, the entering of an agreement with Plaintiff's counsel concerning attorneys' fees and costs, and all other matters pertaining to this lawsuit. I understand that I will be represented by Pelton Graham LLC without prepayment of costs or attorneys' fees. I understand that if plaintiffs are successful, costs expended by attorneys on my behalf will be deducted from my settlement or judgment first. I understand that my attorneys may petition the court for an award of fees and costs to be paid by defendants on my behalf. I understand that the fees retained by the attorneys will be either the amount received from the defendants or approximately 1/3 (33.33%) of my total settlement or judgment amount (including fees), whichever is greater.



DocuSigned by:

YAROSLAV LUPACHOV            YAROSLAV LUPACHOV

E71CFFBE38E54E9...

_____         _____

Signature                       Printed Name

## CONSENT TO BECOME PARTY PLAINTIFF

By my signature below, I hereby authorize the filing and prosecution of claims in my name and on my behalf to contest the failure of Old Homestead Steakhouse and/or its respective owners, affiliated companies, subsidiaries, contractors, directors, officers, franchisees and/or affiliates to pay me minimum wages and overtime wages as required under state and/or federal law, and also authorize the filing of this consent in the action(s) challenging such conduct. I authorize being **named as the representative plaintiff** in this action to make decisions on behalf of all other plaintiffs concerning the litigation, the method and manner of conducting this litigation, the entering of an agreement with Plaintiff's counsel concerning attorneys' fees and costs, and all other matters pertaining to this lawsuit. I understand that I will be represented by Pelton Graham LLC without prepayment of costs or attorneys' fees. I understand that if plaintiffs are successful, costs expended by attorneys on my behalf will be deducted from my settlement or judgment first. I understand that my attorneys may petition the court for an award of fees and costs to be paid by defendants on my behalf. I understand that the fees retained by the attorneys will be either the amount received from the defendants or approximately 1/3 (33.33%) of my total settlement or judgment amount (including fees), whichever is greater.

_____                    _____
Signature                                                         Printed Name